**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TETON HISTORIC AVIATION FOUNDATION**, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>**UNITED STATES OF AMERICA**, *et al.*,<br><br>        Defendants. | Civil Action No. 09-cv-669 (RLW) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Teton Historic Aviation Foundation and Teton Avjet, LLC, d/b/a "Teton Aviation Center," (collectively, "Teton") bring this case against Defendants United States of America and the United States Department of Defense (collectively, the "Government") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, claiming that the Government's actions improperly prevented Teton from acquiring a number of surplus aircraft parts under its auction contract with Government Liquidation, LLC—a private, non-governmental entity that is not a party to this action. After submitting the winning bid in that auction, Teton submitted the list of parts it sought to harvest from the five  source aircraft included in the auction, and, pursuant to the terms of the contract, Teton's requested parts list was forwarded to the Defense Reutilization and Marketing Service ("DRMS")—a Department of Defense component—for final review and approval.[1] Following DRMS's review, many of the parts Teton sought to purchase were deemed unsalable and ineligible for release because of the Government's assignment of certain demilitarization codes to those parts. Through this lawsuit,

---

[1]        DRMS now operates as "DLA Disposition Services."

Teton principally challenges the Government's review and classification of those aircraft parts as arbitrary and capricious, along with a couple of secondary APA challenges.

The parties cross-moved for summary judgment, and on December 21, 2012, the Court notified the parties that it would hold a hearing on those motions.  The Court advised that, in addition to the issues presented in their briefs, the parties should be prepared to discuss whether Teton possesses Article III standing to pursue its APA claims against the Government and, specifically, whether a decision from this Court would redress Teton's injury.  The Court heard argument from the parties during a lengthy hearing on January 15, 2013.  Ultimately, upon consideration of the administrative record in this case, the parties' briefing, and the arguments of counsel, the Court concludes, for the reasons set forth herein, that Teton lacks Article III standing to pursue its claims and will **DISMISS** this action for want of jurisdiction.   In turn, both Plaintiffs' Motion for Summary Judgment, (Dkt. No. 61), and Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 69), will be **DENIED AS MOOT**.


## BACKGROUND

The relevant history of this case begins with an auction.  In August 2008, Government Liquidation, LLC ("GL")—a private, third-party entity with whom the Department of Defense contracts to assist in the sale and disposal of surplus property—posted a bid announcement for the sale of aircraft parts from five "A-4" aircraft bearing tail numbers 154306, 154623, 154337, 153483, and 152863.  (Administrative Record ("AR") at 213-215).  Among other details, the announcement explained that:

> [N]on-hazardous Demil A, B, and Q components in this offer, that may be available include, but are not limited to: instrumentation, communication and navigational equipment, hydraulic and pneumatic components, fuel and restroom

equipment, cabin and cockpit furnishings, galley equipment, landing gears, wheels and tires, and quick engine change components.

(*Id.*).  The announcement indicated that GL's "special terms and conditions apply to this sale," along with the "general terms and conditions of sale . . . which are listed on Government Liquidation[']s web site."  (*Id.*).[2]  It also stated that "[b]uyers['] participation, by placing a bid in a sales event governed by the special terms, shall serve as their acknowledgment of an agreement to be bound by both the general terms and the special terms."  (*Id.*).

The "Special Terms and Conditions of Sale" restated the above description of the aircraft components that might be available through the sale, but it also expressly described components that would not be included:

> Not included are airframe, control surfaces and aircraft skin.  THE AIRCRAFT CARCASS SHALL REMAIN THE PROPERTY OF DOD SURPLUS, LLC ("DOD Surplus").  Further excluded from this offer are munitions, weapons, Flight Safety Critical Aircraft Parts (FSCAP) items, Critical Sensitive Items (CSI), matting, modules, engine containers, ties downs, and counter weights. **NOTE: Aircraft has been subjected to parts reclamation with some parts missing, damaged or loose.**

(*Id.* at 964-95) (emphasis in original).[3]  The "Special Terms" went on to describe the procedure that the component parts sale would follow:

> Payment of the high bid is due within 5 business days of the scheduled close of the auction.  Along with payment buyer will provide a properly completed End Use Certificate ("EUC").  With in [sic] ten days of the sale closing the buyer shall submit a listing of parts to be removed.  The listing shall contain (at a minimum) NSN, Description, manufacturer, cage code and quantity desired by aircraft tail number.  GL shall verify that the parts meet the requirements specified for this sale.  If the buyer has not submitted the parts list in ten calendar days after sale closing, the sale shall be cancelled.  The list will then be sent to DRMS for verification.  Any parts not meeting the requirements shall be deleted from the listing and no adjustment made in sale price.  DRMS shall transmit the list to

---

[2]      For reasons beyond the Court's understanding, the "general terms and conditions" were not included in the administrative record.

[3]      Based on the Court's review of the administrative record, "DOD Surplus" is either another name for Government Liquidation or an affiliate of Government Liquidation.  The parties confirmed this during oral argument.

AMARG for removal.  AMARG shall remove the parts and provide DRMS the actual removal costs.  Buyer shall be informed or removal costs by DRMS.  Buyer is responsible for paying DRMS directly for parts removal costs.  Parts will be released to buyer only after EUC approval and DRMS confirms to GL receipt of removal payment in full.

(*Id.*).[4]

Teton participated in the auction, submitting a sealed bid of $8,250.00.  As it turns out, Teton was the winning bidder and secured the ability to acquire available parts from the five source aircraft.  (*Id.* at 518-519).   Teton deposited $50,000.00 to bind the sale, (*id.* at 500-502, 857-58), and on or around August 28, 2008, it submitted a list of the specific parts requested from each aircraft, (*id.* at 307-354).   Upon receipt, GL conducted a preliminary review of Teton's requested parts list and forwarded that list on to DRMS for final approval, pursuant to the terms of the sale.  (*Id.* at 441-466).   DRMS reviewed Teton's parts list and assigned demilitarization ("Demil") codes to each component part based on upon its corresponding NSN number, where available.  (*Id.*).

DRMS completed its initial review of Teton's requested parts list on or around September 19, 2008, (*id.* at 554-584), and conducted a further review within the following weeks, (*id.* at 593-636).   Ultimately, DRMS divided all of the aircraft parts requested by Teton into two categories: (1) the "Safe to Sell" list, or (2) the "Ineligible for Sale" list.  (*Id.*).   It appears that the "Safe to Sell" list included parts designated as Demil A, B, or Q, while the "Ineligible for Sale" list was comprised of parts classified as Demil C or D.  (*See id.*).   However, before DRMS's determinations were communicated to Teton, the Department of Defense issued a revised policy directive, in or around November 2008, which generally prohibited the public

---

[4]    The term "NSN" refers to "National Stock Number," a unique identifier assigned to material items of supply, including aircraft parts.  "AMARG" stands for the 309th Aerospace Maintenance and Regeneration Group, the U.S. Air Force aircraft missile and storage facility in Tucson, Arizona where the source aircraft were being held.

sale of items classified as Demil B and Q "sensitive." (*Id.* at 1658-1662, 2369-2370).  As a result, DRMS was required to "rescrub" the listing of parts approved for release to Teton to remove items designated as Demil B and Q. (*Id.* at 798).  Following that process, only about thirty (30) categories of parts were categorized as salable and eligible for release to Teton.[5] (*Id.* at 381-386, 798).

On or around March 13, 2009, GL forwarded the final list of approved parts to Teton, along with AMARG's cost estimate for the removal of the approved parts, and inquired whether Teton would proceed with the sale. (*Id.* at 904).  On March 19th, Todd Burlage, Teton's Parts Manager, responded to GL and advised that Teton was reviewing the information and would communicate its decision. (*Id.*).  Subsequently, on March 27th, GL sent another message to Mr. Burlage, advising that "Government Liquidation needs to proceed with the sale or cancel it"; GL requested that Teton provide a response by close of business on March 30, 2009. (*Id.*).  On March 30, 2009, GL received a letter from Teton's attorney, John Fausti. (*Id.* at 909-910). Therein, Mr. Fausti stated, in pertinent part:

> We are concerned that Government Liquidation's refusal to honor this contract is not only a breach of its agreement with Teton Aviation, but that it may also lead to the federal government unnecessarily and improperly destroying the aircraft parts which are the subject of the GL contract.  However, in lieu of our immediately taking emergency action to potentially avoid such destruction, our law firm requests the opportunity to further investigate this matter with our client and to review the Government Liquidation and agency records associated with this transaction to more fully assess the existence of any potential impropriety.

(*Id.*).  In turn, Mr. Fausti requested an additional seven business days for Teton to consider whether to proceed with the sale. (*Id.*).

GL granted Teton's request for additional time that same day, (*id.* at 914), but several days later, Mr. Fausti informed GL that Teton was seeking congressional assistance to obtain the

---

[5]     As Teton requested multiple quantities of many of those thirty (30) part types, the total number of individual parts authorized for release was approximately 189. (AR at 381-386).

five aircraft in their entirety.  (*Id.* at 919).  In response, GL sent an email message to Mr. Fausti on April 6, 2009, explaining as follows:

> The property awarded to Teton Aviation Center was limited to the approved parts, which were to be mined from the A-4 aircraft.  Per our phone conversation, Teton Aviation Center intends to pursue more than the approved parts and may seek after [sic] the entire aircraft.  Government Liquidation can only offer Teton Aviation Center the option to purchase the approved A-4 parts as previously extended.

> The decision to proceed with the purchase of the approved A-4 aircraft parts must be made by April 8, 2009.  The transaction will be cancelled if a decision is not reached by April 8, 2009.

(*Id.* at 929).  The following day, April 7, 2009, Mr. Fausti responded, stating that Teton "intends to take all steps necessary to legally enforce the original terms of the subject contract," threatening judicial action and "emergency relief from district court."  (*Id.* at 937-938).   By April 10, 2009, Teton had not confirmed that it intended to move forward with the sale offered by GL, which prompted Tim Hill, Director of Customer Relations for GL, to formally notify Mr. Fausti that GL was cancelling its sale with Teton:

> The terms of the sale on which your client, Teton Aviation Center, bid indicated that the offering was for parts reclamation of the five A-4 aircraft listed above. Your client was required to identify and list parts it wished the Government to remove from these aircraft.  The request for parts from the five identified aircraft was subject to approval by the DRMS.  These terms were presented to Teton Aviation Center in the Special Terms and Conditions, a copy of which is attached. The Special Terms and Conditions incorporated by reference the General Terms and Conditions of sale, which state in Section 4(K), "In the event that DRMS changes a Demil Code or determines that an item offered for sale by GL may not be sold, or must be sold with restrictions, GL may withdraw the item from sale or place additional restrictions on the sale at any time prior to the removal of the item by the Buyer.  The Buyer will be limited in remedy to a refund of the purchase price and cancellation of the sale."

> It appears that Teton Aviation Center entered into this sale with a mistaken understanding of what was being offered.  As such, and because we value the future business of Teton Aviation Center, we are canceling the sale, and will return the deposit to Teton Aviation Center as soon as possible.  As a reminder, Teton Aviation center agreed [to] Section 11(A) of the General Terms and Conditions, which provide for exclusive jurisdiction and venue in the State of

Arizona, Maricopa County, and any such petition for injunctive relief should be filed here.

(*Id.* at 964).   Shortly thereafter, GL issued a full refund of Teton's $50,000.00 deposit on the sale.  (*Id.* at 967, 1022).[6]

That same day, April 10th, Teton filed the instant action against the Department of Defense, seeking a temporary restraining order to prohibit the destruction or disposition of the aircraft or aircraft parts included in the auction contract between Teton and GL.  (Dkt. Nos. 1, 3). In the course of responding to the temporary restraining order, counsel for the Government discovered that all five of the subject aircraft had already been destroyed.[7]   However, the Government was able to set aside five similar aircraft pending the resolution of this dispute, and the parties agreed to a consent temporary restraining order, which was entered on April 24, 2009. (Dkt. No. 20).   The Order was subsequently converted to a consent preliminary injunction without substantial change on May 13, 2009. (Dkt. No. 27).   Pursuant to that Order, the Government identified five aircraft—tail numbers 153529, 154307, 153484, 153488, and 153459—and agreed to "take all necessary measures to ensure that [those] aircraft are not destroyed or damaged, and that no parts are removed from [those] aircraft."  (*Id.*).   But that is as far as the Order goes.   It does not require or obligate the Government to sell any of the aircraft parts to Teton, or even to place the aircraft up for a public auction following the Court's ultimate ruling on Teton's APA claims.   Regardless, by its terms, the Order remains in place until superseded by a decision from this Court.  (*Id.*).

---

[6]    Aside from the deposit, it does not appear from the record that Teton made any other payments to GL in connection with this sale, including the $8,250.00 purchase price.  Rather, once GL refunded Teton's $50,000.00 deposit, the administrative record suggests that any and all funds Teton had committed to the transaction had been fully recovered.

[7]    Four of the aircraft—tail numbers 152363, 153483, 154306, and 154623—had been destroyed the day prior, on April 9, 2009.  (AR at 80-83, 96-97, 102-103).  The fifth aircraft— tail number 154337—had been inexplicably destroyed on September 17, 2008.  (*Id.* at 84-85)

Subsequently, Teton amended its complaint several times, and the operative pleading in this matter is now the Third Amended Complaint.  (Dkt. No. 38 ("Third Am. Compl.").)  Therein, Teton seeks relief against the United States of America and the Department of Defense and alleges, in salient part, that "DRMS's actions in preventing Teton Aviation from taking possession of the surplus aircraft parts to which it was entitled under the Contract constitutes conduct which is arbitrary, capricious, an abuse of discretion and not in accordance with law." (*Id.* at ¶ 74).  Teton seeks the following relief:

- "[A] judgment declaring that the actions of the United States Department of Defense in preventing the receipt by Teton Aviation of the aircraft parts to which Teton Aviation was entitled under the Contract was arbitrary, capricious, an abuse of discretion and not in accordance with law, and as such are a violation of 5 U.S.C. § 706";

- An injunction against "the United States Department of Defense from any further actions which prevent the receipt by plaintiffs of all the aircraft parts which were sold under the Contract"; and

- An order enjoining the Department of Defense from taking any actions which destroy or endanger any and all OA-4M and TA-4F aircraft at Davis-Monthan Air Force Base, and directing the Department to provide the location of any "departed" OA-4M and TA-4F aircraft.

(*Id.* at Prayer ¶¶ a-f).  At no point during this litigation did Teton assert claims against, or seek to assert claims against, Government Liquidation.

After the parties had fully briefed their cross-motions for summary judgment, the Court issued an Order on December 21, 2012, setting a hearing on those motions.  (Dkt. No. 81).  Along with the issues raised in their briefing, the Court advised the parties to be prepared to discuss "[w]hether Plaintiffs have Article III standing to pursue their claims against Defendants and, specifically, whether the relief Plaintiffs seek from this Court can redress the injury they claim was caused by Defendants."  (*Id.*).  The Court's Order stated, in salient part, as follows:

> As pled, Plaintiffs' claimed injury appears to be their inability to acquire the surplus aircraft parts at issue.  (Third Am. Compl. at ¶¶ 74, 83, 91).  But

Plaintiffs' underlying right to purchase these aircraft parts appears to derive entirely from their contractual relationship with Government Liquidation—a non-governmental, private entity that is not before the Court as a party to this action—and it appears that Government Liquidation cancelled or rescinded its contract with Plaintiffs in April 2009.  (Third Am. Compl. at ¶ 71, Admin. Record at 964).  As such, even if the Court were to grant Plaintiffs the entirety of the relief they seek herein, Plaintiffs' desired redress—the ability to acquire particular aircraft parts—seems to depend on whether Government Liquidation will comply with its prior contractual obligations, either voluntarily or as a result of some future judicial intervention.  *See, e.g.*, *US Ecology, Inc. v. United States DOI*, 231 F.3d 20, 24-25 (D.C. Cir. 2000) ("When redress depends on the cooperation of a third party, it becomes the burden of the [appellant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."); *Emergency Coalition to Defend Educ. Travel v. United States Dep't of the Treasury*, 545 F.3d 4, 10-11 (D.C. Cir. 2008); *Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 493 F.3d 201, 205-07 (D.C. Cir. 2007).  The Court seeks clarification as to whether Plaintiffs have met their burden in this respect.

(*Id.*).  Counsel subsequently appeared for a hearing on Plaintiffs' Motion for Summary Judgment, (Dkt. No. 61), and Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 69), on January 15, 2013.  The Court heard argument for nearly two hours and ultimately took the matter under advisement.

## ANALYSIS

At the outset, the Court believes it important to recognize that Teton's standing is an issue that was raised by the Court *sua sponte*.  The Government did not argue—either in its earlier motion to dismiss, (*see* Dkt. Nos. 22, 29), or in its summary judgment briefing—that Teton lacked standing.  However, the Court has an obligation to confirm its own jurisdiction, and the D.C. Circuit has instructed that "[w]hen there is doubt about a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be."  *Lee's Summit v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000); *see also Catholic Social Serv. v. Shalala*, 12 F.3d 1123, 1125 n.2 (D.C. Cir. 1994) ("Because standing is a jurisdictional doctrine, the Court is obliged to

consider the issue *sua sponte*.").  Indeed, where the Court has doubts about a party's standing, it is reversible error to simply bypass the issue of standing and to proceed to the merits of the case, even "where the merits question may be easily answered."  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).[8]  In keeping with these clearly-established principles, the Court notified the parties, well in advance of the hearing on the cross-motions for summary judgment, that it harbored concerns about Teton's standing and provided the parties with an ample opportunity to address the Court's concerns.  The Court now concludes that Teton fails to establish the requisite standing to pursue its claims in this case.[9]

The doctrine of standing derives from Article III of the Constitution, which "confines the federal courts to adjudicating actual cases and controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  To satisfy the "irreducible constitutional minimum of standing" under Article III, a party must show: (1) that it has suffered an "injury in fact"—an actual or imminent invasion of a legally-protected, concrete, and particularized interest; (2) a causal connection between the alleged injury and the defendant's conduct at issue; and (3) that it is "likely," not "speculative," that the injury "will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504

---

[8]     The Court does not express any opinion as to the merits of Teton's claims.  To be sure, the Court is keenly aware of its obligation "not to decide the questions on the merits for or against the plaintiff" and to "assume that on the merits the plaintiffs would be successful in their claims."  *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).

[9]     The Court notes that the claims in this case are brought by two plaintiffs—Teton Historic Aviation Foundation and Teton Aviation Center.  But for all intents and purposes, the parties have consistently treated both plaintiffs interchangeably.  (*See* Dkt. No. 16) (explaining that the purpose of both entities "include[s] the purchase, restoration, and flying of historic military aircraft"; that both entities are "commonly controlled by Dr. Richard Sudgen"; and that both entities "work collaboratively with regard to their efforts to purchase, restore and fly historic military aircraft, as they did on the Government Liquidation contract which is the subject of the present litigation").  Thus, for purposes of standing, the Court consolidates its analysis as to both plaintiffs, particularly given the parties' failure to identify any meaningful difference between the two, with respect to Article III standing or otherwise.

U.S. 555, 560 (1992). "This triad . . . constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998). To establish standing at the summary judgment stage, as here, a party "cannot rest on 'mere allegations' but must establish each element of standing by putting forth 'specific facts.'" *Dominguez*, 666 F.3d at 1362 (quoting *Lujan*, 504 U.S. at 561). If standing is lacking, then "the dispute is not a proper case or controversy, [and] the courts have no business deciding it, or expounding the law in the course of doing so." *DamilerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

As to the redressability aspect of standing, the D.C. Circuit has repeatedly explained that, "[w]hen redress depends on the cooperation of a third party, 'it becomes the burden of the [plaintiff] to adduce facts showing that those choices [of the third party] have been or will be made in such manner as to produce causation and permit redressability of injury.'" *US Ecology, Inc. v. United States DOI*, 231 F.2d 20, 24-25 (D.C. Cir. 2000) (quoting *Lujan*, 504 U.S. at 562); *see also Miami Bldg. & Contsr. Trades Council v. Sec'y of Def.*, 493 F.3d 201, 205-07 (D.C. Cir. 2007). "Mere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power.'" *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2005) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

Teton does invoke a cognizable injury for standing purposes: its inability to "tak[e] possession of the surplus aircraft parts to which it was entitled under the Contract." (Third Am. Compl. at ¶ 74). Teton also presents evidence to show that its injury is fairly traceable to the Government's challenged conduct—*i.e.*, its classification of particular aircraft parts with particular Demil codes, thereby precluding their release to Teton under its contract with GL. But

Teton fails to establish that a favorable decision from this Court is likely to redress that injury because, even if the Court were to grant Teton the entirety of the relief sought herein—declaring that the Government's review process surrounding the requested aircraft parts was arbitrary and capricious—the Court's ruling would be an empty gesture inasmuch as Teton no longer has any legally enforceable right to acquire the surplus aircraft parts it seeks.  To the contrary, Teton's right to purchase those parts derived exclusively from its contract with GL, and the administrative record clearly and unambiguously establishes that GL canceled that contract years ago and fully refunded Teton's deposit.  (AR at 964, 967, 1022).[10]  Thus, the redress of Teton's injury now depends on the cooperation of GL, an independent third-party not before the Court, and Teton presents no evidence to show that GL is likely to honor its prior contractual obligations.  If anything, GL's cancellation of Teton's contract suggests precisely the opposite. *Compare Emer. Coalition to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 11 (D.C. Cir. 2008) (finding redressability satisfied where plaintiffs provided a letter from the relevant third party stating that it planned to remedy the injury plaintiffs complained of "once the regulatory obstacles [were] removed").

Nor has Teton initiated any legal action against GL to enforce its rights under that contract, whether by challenging the validity of GL's cancellation of the contract or otherwise— a point expressly conceded by Teton's counsel during oral argument.  To the extent it could be suggested that, after obtaining a declaratory judgment from this Court, Teton can then proceed to sue GL to enforce its rights under the contract—an argument that the Court emphasizes Teton did not advance at oral argument—"that is essentially a concession that the redressability

---

[10]     Even the allegations of Teton's own complaint establish as much.  (Third Am. Compl. at ¶ 71) ("On Friday, April 10, at 12:54 p.m. (EST), Teton's attorneys received a brief letter from Government Liquidation canceling Teton's contract and promising to repay to Teton monies paid for parts from the five aircraft.") (emphasis added).

requirement cannot currently be met." *Univ. Med. Ctr. v. Shalala*, 173 F.3d 438, 442 (D.C. Cir.

1999) (explaining that "[r]edressability must be satisfied now to establish jurisdiction").

Several of the above-cited cases from our Circuit lend support to this conclusion.  In

*Miami Building*, for example, after several construction company plaintiffs contracted with

Miami-Dade County to build a commercial airport on surplus Air Force land, the Air Force

ultimately decided not to convey the land to Miami-Dade for use as a commercial airport.  *Miami*

*Bldg.*, 493 F.3d at 202-04.   When the Air Force instead offered the land for "mixed use

purposes," the construction plaintiffs and Miami-Dade County both brought suit against the Air

Force, but Miami-Dade dismissed its lawsuit and elected instead to proceed with the purchase of

the land for "mixed use purposes."  *Id.*  On appeal, the D.C. Circuit succinctly summarized the

construction plaintiffs' inability to establish standing:

> Even were we to direct the Air Force to convey the total surplus acreage, we
> cannot predict with any confidence that Miami-Dade—which voluntarily
> terminated its participation in this lawsuit and, pursuant to an agreement with the
> Air Force, has already accepted a portion of the surplus property for mixed use
> development—would make the policy choice to reverse course and contract an
> airport, thus redressing [the construction plaintiffs'] alleged injury, namely, the
> lost opportunity to build and operate a commercial airport on land conveyed by
> the Air Force for this purpose.

*Id.* at 202.  The Circuit reached a similar result in *US Ecology*, wherein the plaintiff sought

review of the Secretary of the Interior's decision not to convey a particular site to the State of

California for the construction of a low-level radioactive waste facility.  231 F.3d at 24-26.  The

court concluded that the plaintiff's injury was not redressable by the Court because, even if the

Secretary's decision were reversed and the land were offered to the State of California, the

plaintiff could not "demonstrate any legally enforceable right that California must (1) accept the

Ward Valley Site if offered, and (2) proceed with plans to build a [low-level radioactive waste]

facility on the land."  *Id.*  Given the plaintiff's inability to establish standing, the Court of

13

Appeals held that it lacked jurisdiction to hear the dispute. These principles apply with equal force here. Even if this Court were to issue a declaratory judgment finding that the Government's review of the aircraft parts was arbitrary and capricious, the Court cannot predict with any confidence that GL can or will honor its original contract with Teton to sell any of those surplus parts.

Seemingly recognizing these deficiencies, Teton backpedaled from this particular approach to redressability at oral argument and presented a slightly different twist on its standing theory. Rather than arguing that it holds a <u>present</u> right to acquire surplus aircraft parts from A-4 aircraft, Teton essentially contends that a favorable ruling from the Court on its APA claims would likely enable Teton to acquire those parts <u>in the future</u>. According to Teton, if the Court declares that the Government's classification of particular parts was arbitrary and capricious, not only would Teton be able to bid on and purchase those parts from the five aircraft currently being preserved by the injunction in this case, but it could also compete for future contracts on parts from any A-4 aircraft put up for auction. The problem with Teton's theory, however, is that it presents no evidence to establish that any such outcome is likely, and in fact, the administrative record suggests exactly the opposite.

Put differently, regardless of how the Court were to rule on the propriety of the Government's classification of particular aircraft parts, Teton does not show that it is likely that the Government will offer parts from the five aircraft currently being held (or from any other A-4 aircraft, for that matter) for sale to the public through a future auction. Teton does not identify any statute or regulation that requires the Department of Defense to make these aircraft available for sale, and the Court is not independently aware of such authority. In fact, counsel for Teton expressly conceded that it is entirely within the Government's discretion whether to offer these

aircraft (or their component parts) for public sale in the first place.[11]  To be sure, Teton does not seek any affirmative injunctive relief from this Court that would require the Government to make the aircraft available to Teton (and the Court does not opine as to whether it could even entertain such a request for relief).  And though the parties agreed to a preliminary injunction pursuant to which the Government is holding five planes aside until the Court issues a decision in this case, nothing within the terms of that Order obligates the Government to make any of those aircraft or aircraft parts available for sale to Teton, or even to put them up for public auction more generally.  Instead, it appears that the terms of that Order were agreed upon simply to eliminate any exigency surrounding Teton's request for more expedited relief and the threatened destruction of additional aircraft at the time.

Furthermore, an affidavit submitted by the Government confirms that many of the A-4 aircraft held by the Government are slated for other purposes, including parts reclamation for other active aircraft in the Navy's fleet, foreign military sales, and potential museum placement. (Dkt. No. 68-1 at ¶¶ 17-21).  While the affidavit states that the particular aircraft covered by the injunction have all been  "turned over the DLA for eventual disposal," (*id.* at ¶ 21), this does not mean that it is likely that DLA Disposition Services will ultimately convey those aircraft to GL for public auction.  Rather, DLA Disposition Services (formerly DRMS) disposes of surplus goods in any number of ways, including by destruction or shredding—an outcome that seems particularly likely here, given that after GL canceled its contract with Teton, the original source aircraft were destroyed, rather than being offered for auction and sale to another buyer.  (AR at

---

[11]    At best, Teton's counsel referred to the Government's policy that particular aircraft components (*i.e.*, those classified as Demil B or Q "sensitive") are not required to be shredded. But this is a far cry from establishing that those parts must be made available to the public, and in fact, the very policy directive upon which Teton appears to rely mandates the reutilization of those parts within the Department of Defense.  (*See* AR at 2369-2370).

80-85, 96-97, 102-103).  In fact, Teton's own briefing points out that, at least as of a few years ago, the Government's intent appeared to be to destroy and shred all A-4 aircraft moving forward, rather than to release parts from those planes for sale to the public.  (*See id.* at 123 (explaining that Navy A-4 aircraft turned over were meant for disposal and shredding), 269 (explaining that DRMS did not anticipate receiving any "future A4 aircraft as the Navy is destroying them")).  Accordingly, the Court concludes that Teton fails to establish that it is likely, as opposed to merely speculative, that a favorable decision from this Court will redress the injury it attributes to the Government's challenged actions.

None of the cases raised by Teton's counsel during the hearing change this result.  First, Teton relied heavily on *Abigail Alliance for Better Access v. Eschenbach*, 469 F.3d 129, 135 (D.C. Cir. 2006), arguing that it will likely be able to acquire surplus aircraft parts in the future because it will be in GL's "pecuniary interest" to put the replacement aircraft (or other A-4 aircraft) up for public auction.  This argument is unavailing.  First, Teton incorrectly assumes that GL holds title to any A-4 aircraft in the first place—and if GL does not own or control the aircraft, it certainly cannot make the decision to put the aircraft up for sale.  To the contrary, the only evidence before the Court on this issue indicates that the planes covered by the injunction are currently being held by DLA Disposition Services, and not GL.  Nor does Teton present evidence—in the administrative record or otherwise—to establish that any A-4 aircraft are in the possession, control, or ownership of GL.  But even if GL did presently possess any A-4 aircraft, the procedural history of this dispute and the evidence in the administrative record belie the conclusion that GL would sell the aircraft for pecuniary gain, given that, after GL canceled its original contract with Teton, it did not attempt to resell the five source aircraft to another bidder.  Instead, they were simply destroyed.  Teton also invoked *Community Nutrition Institute v. Block*,

698 F.2d 1239 (D.C. Cir. 1983), and *Humane Society of the U.S. v. U.S. Postal Service*, 609 F. Supp. 2d 85 (D.D.C. 2009), for similar propositions, but the Court finds Teton's reliance on these cases equally unpersuasive.

In addition, Teton placed particular emphasis on *CC Distributors, Inc. v. United States*, 883 F.2d 146, 151 (D.C. Cir. 1989), in arguing that a favorable decision from the Court is likely to redress its injury because Teton will be able to "compete" for a contract to purchase the surplus aircraft parts it seeks in the future, even if it cannot say for sure whether it will ultimately be awarded a contract. This argument also misses the mark. It is true that the loss of the ability to compete for a contract can constitute a cognizable injury for Article III standing purposes. But to compete for a contract, there must be a contract to compete for in the first place, and, as set forth above, Teton simply does not establish a likelihood that the Government will place any additional A-4 aircraft up for auction in the future, whether through GL or otherwise.[12]

As a final effort to establish standing, Teton suggested, in conclusory fashion, that its injuries are not dependent on a third party because GL is not truly an independent third party from the Government. In so arguing, Teton pointed to two general statements in the Government's briefing and claimed that, while GL is technically the contracting party, the Government controls the ultimate outcome. But neither the administrative record nor any other evidence before the Court supports this assertion, and at this stage, Teton cannot rely on "mere allegations" to establish standing. *Lujan*, 504 U.S. at 561; *Dominguez*, 666 F.3d at 1362.

---

[12]     Teton also referenced *West Virginia Ass'n of Community Health Centers, Inc. v. Heckler*, 734 F.2d 1570 (D.C. Cir. 1984), as standing for the proposition that providing a party the ability to qualify for federal funding—even if the party is not certain to receive federal funding—would meet the redressability prong of Article III standing. In analogizing the ability to qualify for federal funding with the ability to compete for surplus aircraft parts contracts, however, Teton continues to gloss over the piece that is missing from its argument—the contracts (or, as in *Heckler*, the federal funding) must be offered in the first place. And Teton simply has not shown that the Government is likely to offer any A-4 aircraft for purchase in the future.

Ultimately, because Teton's injury is not likely to be redressed by a favorable decision from the Court, the Court concludes that Teton lacks Article III standing to pursue its claims in this case.  In reaching this conclusion, the Court is mindful that the relevant question is not whether it is certain that the Court's decision will redress GL's injury, but only whether it is likely.  *Lujan*, 504 U.S. at 561.  But based on the present posture of this dispute and the record before the Court, Teton simply fails to meet this standard.

## CONCLUSION

For the reasons set forth above, the Court concludes that Teton lacks Article III standing to pursue its claims and will therefore **DISMISS** this case for want of jurisdiction.  As a result, both Plaintiffs' Motion for Summary Judgment, (Dkt. No. 61), and Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 69), will be **DENIED AS MOOT**.  An appropriate Order accompanies this Memorandum Opinion.

Date:  January 18, 2013

_____
ROBERT L. WILKINS
United States District Judge