# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TETON HISTORIC AVIATION )
FOUNDATION, *et al.*, )
)
Plaintiffs, )
)
v. )            **Civil Case No. 09-669 (RJL)**
)
UNITED STATES OF AMERICA, *et al.*, )
)            **FILED**
Defendants. )
                                            **MAR 3 1 2017**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
March 31st, 2017 [Dkts. #111, #112]

Plaintiffs Teton Historic Aviation Foundation and Teton Avjet LLC ("the Tetons")

operate a non-profit organization dedicated to maintaining historic aircraft. In order to

undertake the maintenance of military aircraft, they require replacement parts, which they

sometimes obtain from surplus aircraft that the Department of Defense ("DOD") releases

for sale to the public. Plaintiffs bring this suit to challenge the classification of certain

parts it wants, which parts DOD and related sub-agencies (together, hereinafter, "DOD"

or "the Government") classified as unavailable for release to the public. It also

challenges various other aspects of DOD's process for selling parts to the public or

destroying parts that it does not sell to the public, as the case may be. This case is

currently before the Court on cross-motions for summary judgment based on the

administrative record. [Dkts. #111, #112]. Upon consideration of the pleadings, the

administrative record, and the relevant case law, the Court concludes that plaintiffs have

not presented any legal basis to invalidate DOD's classification decisions or the way

DOD executed its discretion in disposing of surplus aircraft parts.  Accordingly, the

defendants' motion [Dkt. #112] is **GRANTED** and the plaintiffs' motion [Dkt. #111] is

**DENIED**.

## BACKGROUND

I will not recite the detailed chronology of the controversy that gives rise to this

case because it can be found at *Teton Historic Aviation Found. v. Dep't of Defense*, 785

F.3d 719 (D.C. Cir. 2015) and in the January 18, 2013 decision [Dkt. #84] that gave rise

to that appeal.  A brief summary of the facts will suffice.  Plaintiffs, the Tetons, won an

auction that entitled them to request parts from five surplus military aircraft and to

purchase, at the auction price, whichever of those parts DOD policy would allow to be

released.  Alternatively, they could pass on the option to purchase if the parts to be

released were not worth the auction price.  Between the time the Tetons won the auction

and the time DOD issued a decision about which requested parts it would release, the

agency changed its policy pursuant to a report by the Government Accountability Office

that had recommended tightening controls on surplus military equipment.  The new

policy made many previously available parts unexpectedly unavailable to the Tetons.[1]

The agency also evaluated for the first time a number of parts from the aircraft that the

Tetons had bid on.  The parts being classified for the first time were assigned Demil Code

---

[1] Each part gets classified with a "Demil Code."  Parts with Demil Codes A, B, and Q had been available to the public, whereas Demil Code D was unavailable.  Under the new policy ("the 2008 policy"), Code B equipment was made unavailable.  Additionally, all Code Q equipment had to be sub-classified as either "sensitive" or "non-sensitive." Sensitive Q equipment was also made unavailable.

D, which meant they were unavailable. Not being satisfied with the parts they would receive, the Tetons began a protracted discussion with DOD challenging that the parts should be made available. They also objected to the time and cost for removing the parts from the planes, even though, once again, these matters were explicitly left up to DOD in the option contract. After the time had passed for the Tetons to exercise their right to purchase the parts, the sub-agency responsible for handling surplus military equipment destroyed the aircraft.[2] Subsequently, the third-party contractor responsible for facilitating the auction and the ensuing transaction formally notified the Tetons that it was exercising its right under the contract to cancel the sale. DOD has since set aside other aircraft of the same type in order to ensure plaintiffs could receive the parts if so entitled.

The Tetons filed suit to challenge DOD's decision that certain parts were unavailable for sale.[3] The prior District Court Judge handling this case dismissed the claims for lack of standing, holding that plaintiffs might not be able to get the parts they sought even with a favorable outcome. *See* 917 F. Supp. 2d 129 [Dkts. #84, #85]. On appeal, our Circuit Court reversed. *Teton*, 785 F.3d 719. The Government argued before the Circuit that DOD had no obligation to put the parts up for sale even if the Tetons prevailed on the question of how parts should be classified. Therefore, the Government

---

[2] One of the planes was, inexplicably, destroyed even before this time, but that fact is irrelevant to the analysis here because (1) the plane would have been destroyed with the others when the time on the Tetons' option elapsed, and (2) the DOD's substitute planes moot the controversy over whether the decision to destroy the original planes was an unlawful agency act that harmed plaintiffs.

[3] The Tetons also complain about several aspects of the agency's conduct in facilitating the sale of surplus parts, including the reasonableness of the quoted cost and time to remove parts, its alleged "rush" to destroy the planes at issue, and the legality of destroying parts that could be made available to the public.

reasoned, plaintiffs could not expect a legal victory to redress their injuries.  The Circuit

agreed with the premise, but disagreed that it made plaintiffs' injury unredressable.

Although DOD indeed "might do almost anything with its own property whether Teton

wins or loses," *id.* at 726, and despite the fact that "no [] rule or law would force the

[DOD] to do anything at all" with respect to the surplus parts, *id.* at 727, it was still

reasonably likely based on prior experience that DOD would release the parts for sale if

they were classified differently upon review.  The Circuit therefore remanded for merits

proceedings, that is, to decide whether DOD was required to reclassify, as available to be

released, the parts plaintiffs want.[4]

On remand, plaintiffs amended their complaint slightly, this time including more

factual allegations purporting to show that the parts pose no safety concern and also

including a more specific request for relief.  *See* Motion to Amend Am. Compl. [Dkt.

#102].  In all other respects, the Fourth Amended Complaint remains the same as the

previously operative pleading.  The parties then submitted cross-motions for summary

judgment on the basis of the administrative record.  Plaintiffs move for judgment on

several grounds, some of which are only barely developed in their memoranda.

Construing their filings in a light most favorable, I will address the following arguments:

(1) the requirement for reasonable agency action in the Administrative Procedure Act

("APA") prohibits DOD from classifying certain parts as unavailable to the public,

(2) the APA requires better support on the record for certain classification decisions,

---

[4] The Circuit could not pinpoint plaintiffs' exact theory of relief, but relied on the premise that plaintiffs
ultimately sought to have DOD reclassify the parts they wanted. *See* 785 F.3d at 725, n.5.

(3) statutory law and DOD's own regulations prohibit DOD from destroying certain parts, (4) the APA prohibits DOD from charging an unreasonable amount to remove parts, and (5) the requirement for reasonable agency action prohibited DOD's "rush" to destroy the planes at issue when discussion about the sale of parts was still underway. Government defendants respond that there is no legal prohibition on destroying surplus parts; they also move for judgment on the ground that the decision whether and how to make surplus parts available to the public is not reviewable under the APA, but if it is, the decision was lawful, reasonable, and supported in the record.

## STANDARD OF REVIEW

On motion for summary judgment involving judicial review of final agency action under the APA, "the Court's role is limited to reviewing the administrative record." *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (citations omitted). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to made the decision it did." *Select Specialty Hosp.–Bloomington, Inc. v. Sebelius*, 893 F. Supp. 2d 1, 4 (D.D.C. 2012) (citations and internal quotation marks omitted).

Under the APA, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). The hallmarks of such impermissible agency action are (1) relying on factors which Congress did not intend for the agency to consider, (2) failing to consider an important aspect of the problem, (3) offering an explanation that runs counter to the evidence before the agency, and (4) offering an explanation that is so irrational that it

could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In order for courts to properly review agencies under this standard, the agency must also explain on the record its final decision by reference to "the relevant data." *Id.* And although it is permissible for an agency to make a decision that directly contradicts an earlier approach to a similar situation, when so doing, it must "supply a reasoned analysis for the change." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010); *accord FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 514-15 (2009).

## ANALYSIS

### I.  Plaintiffs Are Excused From Pursuing Further Administrative Remedies.

As a threshold matter, I will address the Government's suggestion that this matter is not ripe for the Court to decide because plaintiffs have not pursued the administrative appeal remedy that was available to them. Defs.' Mem. & Opp'n 13, n.4 [Dkt. #112-1]. Curiously, the Government raises this contention in a footnote. Perhaps that is because it does not dispute plaintiff's response that this is the first time in seven years of litigation that the agency has suggested further administrative recourse, including the time plaintiffs—during their attempt to secure the aircraft parts—requested information about what internal process they might use to challenge DOD's classification decisions. *See* Pls.' Reply 24-25 & n.20 [Dkt. #115]. Nor does the Government claim that the exhaustion of administrative remedies is a jurisdictional prerequisite in this case—that is, the Government identifies no law requiring plaintiffs to proceed through an

administrative process before seeking judicial review.  Accordingly, "the district court

may, in its discretion, excuse exhaustion if the litigant's interests in immediate judicial

review outweigh the Government's interests in the efficiency or administrative autonomy

that the exhaustion doctrine is designed to further." *Avocados Plus Inc. v. Veneman*, 370

F.3d 1243, 1247 (D.C. Cir. 2004) (internal quotation marks omitted) (quoting *McCarthy*

*v. Madigan*, 503 U.S. 140, 146 (1992)).  Because the Government has not identified any

specific interest it has in forcing plaintiffs through the administrative process, I find that

plaintiffs, who made reasonable attempts to use the correct procedure and have long

awaited judicial review, are excused from pursuing any additional administrative

remedies.

## II.    The APA Does Not Require DOD to Reclassify the Surplus Aircraft Parts or Offer Them for Sale.

Plaintiffs challenge as arbitrary and capricious both the classification of certain

parts as Demil Code D and the policy that parts with a Demil Code B, sensitive Q, and D

be prohibited from sale to the public. *See* Pls.' Reply 23 (crystallizing which agency

"decisions" it challenges).

First, as to the contention that some parts were misclassified, plaintiffs start from

the presumption that DOD is bound by its own Defense Demilitarization Manual.

Defendants argue that the Court should not apply the Defense Demilitarization Manual

against DOD because it only guides what is fundamentally a discretionary decision.

Although I hesitate to interfere in the discretionary decisions of the military, it is settled

law that where an internal agency manual affects the concrete interest of a member of the

7

public, the Court can, and should, require the agency to follow its own procedures by applying the manual itself as a judicially manageable standard. *See Morton v. Ruiz,* 415 U.S. 199, 235 (1974); *Mass. Fair Share v. Law Enf't Assistance Admin.,* 758 F.2d 708, 711 (D.C. Cir. 1985). I will not, however, go any further than applying the manual as written by the agency. After all, Congress committed to DOD, as an expert in military matters, the responsibility and discretion to come up with the comprehensive scheme captured in the manual.

Thus, using the manual as the applicable standard, plaintiffs argue that because the aircraft at issue are "attack *trainers,*" not the usual militarized attack planes, they should have been classified according to Category IX of Appendix 4 of the Defense Demilitarization Manual, which applies to "Military Training Equipment," not Category VIII, which applies to "Military Aircraft." *See* Pls.' Mem. 23-25 [Dkt. #111]. I disagree. Plaintiffs cite evidence in the record that the individual who made the classification decision for the parts at issue used Category VIII to apply Demil Code D to all parts, rather than Category IX, which would have created a presumption for Demil Code B. *Id.* at 24. The Government responds that Category VIII is the correct category because "Military Aircraft" is the more specific category and the text of the Defense Demilitarization Manual explicitly exempts training aircraft from Category VIII only when the aircraft have "reciprocating engines," which the planes at issue do not. *See* Defs.' Mem. & Opp'n 16-17.

In reviewing the record, I can't help but conclude that the Government has the more natural reading of the Defense Demilitarization Manual, which contemplates how to

classify training aircraft in the text of Category VIII ("Military Aircraft"), but not in the
text of Category IX ("Military Training Equipment").  Plaintiffs' contention that
Category IX lists "attack trainers" as a piece of "military training equipment" that is
"normally assigned" Demil Code B, see AR2456, is unconvincing because it is unclear
from the text of that section whether "attack trainers" in this context refers to aircraft at
all.  I therefore affirm the DOD decision to assign Demil Code D to the surplus parts that
plaintiff challenges.[5]

Next, plaintiffs challenge the decision to prohibit the release of parts classified as
Demil Code B, sensitive Q, and D.  In plaintiffs' view, it is arbitrary and capricious to
prohibit the release of surplus parts to the public —no matter the Demil Code—on a
national security rationale when members of the public already have access to those parts,
or, as in this case, already have permission from the FAA to fly privately owned versions
of the same planes.  That basis for a challenge, however, is not cognizable under the
APA.  DOD commits no logical error by choosing to stop the flow of sensitive parts into
the public simply because some of those parts are already there.  Perhaps it would be
even better to attempt to recall sensitive parts, but an agency is, after all, not required to
implement the most stringent policy that is logically consistent with its expert judgment.

---

[5] Even if plaintiffs are correct that the only lawful classification of the attack trainer parts is Demil Code
B, it would not affect the ultimate question whether the parts are not available for sale to the public.
Because the November 2008 policy memorandum does not allow Demil Code B parts to be released to
the public, if DOD can rely on it, then the classification decision is immaterial and defendants win
summary judgment regardless.

Plaintiffs have therefore failed to identify an inconsistency that would merit concern under the *State Farm* factors, or any other principle of administrative law.

To the extent that the November 2008 policy changed the DOD's position with respect to Demil Code B and sensitive Q parts, it does require an explanation on the record. *Jicarilla*, 613 F.3d at 1118. Plaintiffs concede that DOD offered national security concerns as the basis for not releasing the parts, but they attempt to undermine that explanation by speculating that the real reason was that DOD was facing public scrutiny for its accidental release of sensitive parts from another type of aircraft not relevant here. Pls.' Mem. 19. Put simply, plaintiffs ignore the elephant in the record. A Government Accountability Office report from 2006 assessed that the DOD "systems, processes, and controls" for disposing of surplus parts was *not strict enough* to prevent sensitive parts from falling into unauthorized hands. AR1297; *see generally* AR1191-AR1287; AR1288-AR1301. The expert, considered, multi-year study explicitly recommends that DOD adopt stricter policies, and the November 2008 memorandum fulfills that recommendation by making Demil Code B and sensitive Q parts unavailable to the public in order "[t]o strengthen current controls and to mitigate future security risk." AR2369-70; *see also* AR1309 (explicitly linking the GAO report and the new Demil Code B and Q policy). This record explanation for DOD's change in policy more than satisfies the APA !

Finally, plaintiffs argue that applying the November 2008 policy change, as it affected plaintiffs' existing contract, violates 40 U.S.C. § 544, which protects the title of bona fide purchasers of government property where the agency transferred title but failed

to comply with the preconditions required by the Federal Property and Administrative Services Act ("the FPASA"). Section 544 of the FPASA is not applicable here. First, it is the DOD policy on demilitarization, not the FPASA, that prevented the Government from releasing the parts here. Second, plaintiffs have never had title to any government property; they only had an option to purchase parts, which option they never exercised. Accordingly, the Government was still within the appropriate timeframe to apply any preconditions for sale that it had.

In sum, DOD's decision not to release Demil Code B, sensitive Q, and D parts was lawful and reasonable, and it is supported by the record.

### III.    DOD Is Not Prohibited From Destroying Surplus Aircraft Parts.

Plaintiffs argue that the controlling law prohibits defendants from destroying surplus parts of the type plaintiff seeks. For the purpose of this question, I will assume, without deciding, that plaintiff has standing to challenge the practice of destroying parts.[6] I take as a starting point our Circuit's clear statement that "no [] rule or law would force the [DOD] to do anything at all" with respect to the surplus parts. *Teton*, 785 F.3d at 727; *accord id.* at 726 (DOD "might do almost anything with its own property whether

---

[6] The parts plaintiffs seek in the instant action would be taken from planes the defendants have set aside to accommodate this litigation. Hence, the practice of destroying planes, even the original planes that plaintiffs bid on, no longer has any direct effect on plaintiffs here. Still, the D.C. Circuit did reason that plaintiffs' standing derives in part from the likelihood that defendants would sell parts it does not destroy in the future. *Teton*, 785 F.3d at 726-27. Accordingly, I will resolve this legal question out of an abundance of caution.

11

Teton wins or loses").[7]  To say the least, plaintiffs face an uphill battle in demonstrating what law specifically prohibits destruction of surplus parts.

Each of the statutory restrictions that plaintiffs invoke are inapplicable here.  First, they contend that the proscriptions at 18 U.S.C. § 641 and 18 U.S.C. § 1361 prohibit the destruction of government property without proper authorization.  *See* Pls.' Mem. 33, n.29 (erroneously citing 16 [*sic*] U.S.C. §§ 641, 1361); Pls. Reply 17-18.  Those criminal statutes plainly do not apply to an agency's internally authorized decision to destroy property.  Among other reasons they are inapposite, the statutes have scienter requirements.  That is, the crime requires that the target either intends to injure the United States or to take from the United States.  Not even a *pro se* plaintiff would accuse DOD of that here.

Next, plaintiffs invoke 40 U.S.C. § 527, which they say authorizes GSA and its delegates (in this case, DOD) to destroy surplus property only if "it has (1) no commercial value or (2) the estimated cost of continued care and handling exceeds the estimated proceeds from sale." Pls.' Reply 17.  Because plaintiffs did not raise this affirmative argument until their reply memorandum, they are likely estopped from making it, but in an abundance of caution, I hold that it is unmeritorious as well.  The statute says GSA "may" destroy the property in the enumerated circumstances, not that it may *only* proscribe destruction in those circumstances.  Under plaintiffs' erroneous

---

[7] I adopt these statements pursuant to the law-of-the-case doctrine, which dictates that when the Circuit Court answers a question "explicitly or by necessary implication" on appeal, a court later involved in the same case should not revisit the question. *LaShawn A. v. Barry*, 87 F.3d 1389, 1394 (D.C. Cir. 1996).

reading of the statute, for instance, DOD could not destroy property in order to safeguard national security. That is plainly incorrect. Moreover, plaintiffs have not even attempted to demonstrate that DOD failed their proffered test. Continuing to store these aircraft—presumably a relatively expensive endeavor—may very well have cost more than the $8,250 the Tetons would have paid under their contract.

Nor are defendants bound by anything in a 2007 settlement agreement with different litigants, under which DOD and its agents agreed to sell surplus parts from a specific "27,000,000 pounds of aircraft scrap." *See* AR640-46 (signed Sept. 12, 2007 and filed Sept. 19, 2007). Plaintiffs characterize this agreement as creating a "legal obligation" that defendants not destroy surplus aircraft. Pls.' Reply 17, n.14. But plaintiffs have not demonstrated that the "the 27,000,000 pounds" includes the surplus aircraft they claim an interest in, nor have they demonstrated that they are empowered to enforce the settlement agreement. Moreover, nothing in the settlement agreement prohibits the destruction of parts that DOD deems unsalable. Quite to the contrary, it anticipates the destruction of unsalable parts and specifically states that "any subsequent change in . . . policy of the DoD . . . , to include a delay or prohibition of sale of DEMIL B and Q parts by DoD, will not be deemed a breach of this settlement agreement." AR643-44. The November 2008 memorandum is a just such a change in policy.

Finally, plaintiffs cite to the November 2008 policy itself [AR2369-70], claiming that destroying surplus parts classified as Demil B or Demil Q non-sensitive violates DOD's own instruction to keep those parts in long-term storage for reutilization or other military programs. Pls.' Mem. 33. But the policy memo is addressed to the Secretaries

of the Army, Navy, Air Force, and Director of the Defense Logistics Agency and respects the availability of parts for military programs. It is not meant to communicate to the public what parts they can expect will be available for acquisition. Because plaintiffs are not in the zone of affected interests for a policy requiring the military to keep parts on hand rather than to destroy them, plaintiffs cannot challenge what amounts to a potential screw up of the military's internal procedures to maximize efficient use of resources. The question is whether the internal procedure or memo "affect[s] individual rights." *See Morton v. Ruiz,* 415 U.S. 199, 232-35 (1974). Here it is clear that the internal memorandum was intended to affect the military's efficient use of its own equipment, not an individual's right to purchase the equipment.

## IV.     There Are No Judicially Manageable Standards for Reviewing DOD's Procedure for Selling the Surplus Aircraft Parts.

Plaintiffs' remaining challenges are best summarized as objections to the procedure DOD uses for selling its surplus parts, namely the cost and efficiency of removing available parts from surplus aircraft and the decision to "rush" to destroy the planes when plaintiffs were trying to inquire as to the classification of parts. These decisions are not reviewable because they amount to internal procedures for effectuating DOD policy. It is simply not the proper role for a court to review the particulars of peculiarly ministerial tasks such as these. *See Heckler v. Chaney,* 470 U.S. 821, 831-32 (1985) (decision not reviewable when it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "the procedures it adopts for implementing [a] statute"); *Vermont Yankee Nuclear Power Corp. v. Nat. Res.*

*Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("the formulation of procedures [is] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). What is more, plaintiffs explicitly agreed in their option contract to be subject to the discretion of DOD on these issues and, therefore, share blame in their injury. Accordingly, this is not an appropriate case to concoct a novel standard by which to judge the agency's procedures for disposing of surplus military property.

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiffs' Motion for Summary Judgment and GRANTS defendant's Cross-Motion for Summary Judgment. An order consistent with this Memorandum Opinion shall follow.

RICHARD J. LEON
United States District Judge